IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE



| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Criminal Action No. 13- 39 - UNA |
| | ) | |
| JOSEPH TERRANOVA, | ) | |
| | ) | |
| Defendant. | ) | |

## INFORMATION

The United States Attorney for the District of Delaware charges that:

### COUNT I

### INTRODUCTION

At all times material to this Information:

#### *Common Individuals and Entities*

1.      Wilmington Trust Corporation ("WL"), headquartered in Wilmington, Delaware, was a Bank Holding Company whose securities were traded on the New York Stock Exchange under the trading symbol "WL."

2.      Wilmington Trust Company ("WTC" or the "Bank") comprised WL's Delaware-based, wholly-owned retail and commercial banking subsidiary and was a financial institution as defined by Title 18, United States Code, Section 20, with deposits insured by the Federal Deposit Insurance Corporation.  Beginning in or around December 2008, WTC participated in the Department of the Treasury's Capital Purchase Program ("CPP"), a subset of the Troubled Asset Relief Program ("TARP").

1

3.     JOSEPH TERRANOVA ("Terranova" or "defendant") was employed by the Bank as a Relationship Manager ("RM") until his promotion on January 22, 2008, to Vice President/Division Manager of the Delaware Commercial Real Estate Division.

4.     The following individuals were also employed by WTC:

A.     Bank Employee A was employed by the Bank as Vice President/Division Manager of the Delaware Commercial Real Estate Division, until his promotion on January 22, 2008, to Vice President/Division and Delaware Market Manager. In both positions, Bank Employee A was defendant's direct supervisor.

B.     Bank Employee B was employed by the Bank as its Credit Policy Manager.

C.     Bank Employee C was employed by the Bank as its Chief Credit Officer.

D.     Bank Employee D was employed by the Bank as its Chief Operating Officer for the Mid-Atlantic Market.

E.     Bank Employee E was employed by the Bank as a Senior Real Estate Credit Officer.

F.     Bank Employee F was employed by the Bank as its Head of Credit Risk Management.

5.     Michael A. Zimmerman ("Zimmerman") was the owner and President of BBC Properties, Inc. ("BBC"), a real estate development company located in Dover, Delaware.

6.     Member A was a realtor and partner in several projects with Zimmerman, including but not limited to Salt Pond Plaza, LLC.

7.     Salt Pond Plaza, LLC ("Salt Pond") was a limited liability corporation established by Zimmerman for the purpose of developing a commercial center adjacent to the Salt Pond Community and Golf Course in Ocean View, Delaware (the "Salt Pond project"). Zimmerman owned an 89% share in the Salt Pond project, while Member A owned an 11% share. Between

2

January 10, 2007, and December 10, 2009, Salt Pond obtained three loans from WTC totaling approximately $12,231,123 to develop the Salt Pond project.

## THE CONSPIRACY

8.     From on or about August 25, 2005, through on or about March 31, 2010, in the District of Delaware, defendant Joseph Terranova knowingly and intentionally combined, conspired, confederated and agreed with others known and unknown to the United States Attorney to commit an offense against the United States, to wit: bank fraud, that is, to knowingly execute a scheme and artifice to defraud a financial institution, to wit, WTC, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, a financial institution, to wit, WTC, by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Sections 1344, and 2.

### *Objectives of the Conspiracy*

9.     It was an objective of the conspiracy for the defendant and his co-conspirators to extend credit to Bank customers under terms materially inconsistent with those approved by the Bank's Loan Committee, or under terms that would not have been approved if presented to the Bank's Loan Committee.

10.     It was a further objective of the conspiracy for defendant and his co-conspirators to fraudulently conceal the Bank's true financial condition in many ways, including by extending new credit to clients to keep existing loan interest payments current, and by causing the Bank to misrepresent its reporting of past due and nonperforming loans.

### *The Ways, Manner, and Means of the Conspiracy*

11.     The ways, manner and means by which the defendant and his co-conspirators sought to accomplish the conspiracy included, but were not limited to, the following:

### **The Salt Pond Project**

12.     On December 27, 2006, defendant submitted a Loan Approval Data Sheet ("LADS"), along with an interoffice memorandum, to the Bank's Loan Committee requesting approval for a $10,000,000.00 loan for the Salt Pond project. Defendant represented that the anchor tenant for the project would be a Harris Teeter grocery store. The Budget submitted by defendant in connection with the memorandum to the Loan Committee stated that $1,000,000.00 of loan proceeds would be in the form of an Equity Take Out. The memorandum further specified that the principals would "be permitted to draw down on the equity funds on a pro-rated basis only when tenants begin paying rent for the three sites."

13.     On or about December 27, 2006, the Bank's Loan Committee approved the $10,000,000.00 loan for the Salt Pond project in accordance with, *inter alia*, the terms set forth in Paragraph 12.

14.     The "Construction Loan Agreement" dated January 10, 2007 (the "Agreement"), made between WTC and Salt Pond was signed by Zimmerman as Manager and by defendant on WTC's behalf, as a Vice President. The Agreement differed materially from the Budget presented to the Loan Committee two weeks prior with respect to the amount of the Equity Take Out and the triggering events to fund the Equity Take Out. The Agreement increased the budgeted Equity Take Out category from $1,000,000.00 to $2,000,000.00, and decreased the on- and off-site improvements category from $2,000,000.00 to $1,000,000.00.

4

15.     Moreover, the conditions dictating when the principals were entitled to receive payment of the Equity Take Out also changed. The Agreement stipulated that the Equity Take Out would be funded as follows:

> (i) $1,000,000 shall be funded upon preliminary approval of the Record Development Plan for the Property by Sussex County and the final execution of the Harris Teeter lease; (ii) $600,000 upon execution of the lease for the 12,900 square foot retail pad site; and (iii) $400,000 upon execution of a ground lease for the final (smaller) retail pad site.

Thus, the Agreement permitted the members to draw down on the equity funds prior to any of the tenants paying rent, in contravention of the representations made by defendant in his memorandum to the Bank's Loan Committee.

16.     Defendant's actions in entering into the Agreement, as executed, were in direct violation of the Bank's Lending Policy, which stated that "[a]ny material changes to a previously approved loan must be approved by the authority which granted the original loan approval."

17.     On May 21, 2007, defendant caused WTC to wire $1,000,000.00 in loan proceeds to the BBC Operating Account controlled by Zimmerman. At that time, however, defendant knew that Harris Teeter had not entered into a lease with Salt Pond, as required by the Agreement.

18.     Salt Pond and Harris Teeter eventually entered into a lease agreement on June 27, 2007. The Agreement stated that Harris Teeter was not obligated to commence paying rent until Salt Pond obtained executed leases for the two other pad sites. As of January 2013, Salt Pond had not obtained executed leases, and Harris Teeter had not paid Salt Pond any rent.

19.     On January 11, 2008, Zimmerman sent a fax to defendant, which stated the following: "Send $ $1,000,000 ASAP I have to pay my bar tab." Attached to this fax was a letter from a realtor dated January 11, 2008, and addressed to Salt Pond Plaza c/o Mr. Michael

5

Zimmerman. The letter expressed Rite Aid's interest in a ground lease for the Salt Pond property. The letter further stated that "Rite Aid shall have one hundred twenty (120) days from the date of this letter of intent (the 'Examination Period') to (i) examine the suitability of the Premises for Rite Aid's intended use…" In addition, the letter agreement stated it was "non-binding upon either party" and was "subject to the final execution of a Lease suitable to both parties, which . . . both parties shall use commercially reasonable efforts to negotiate."

20.     Zimmerman signed the last page of the letter as managing member of Salt Pond to indicate his agreement to the terms in the letter. As set forth by its express terms, the letter was clearly a letter of intent only and not an executed ground lease for one of the remaining retail pad sites at Salt Pond. As mentioned above in Paragraph 15, the Agreement required executed ground leases for the pad sites in order for the Bank to fund the second half of the Equity Take Out.

21.     On or about January 16, 2008, defendant caused the Bank to fund the second $1,000,000.00 advance under the Equity Take Out. Defendant was aware that Zimmerman was not entitled to such funds under the Agreement, as Zimmerman had failed to secure leases for the two Salt Pond pad sites pursuant to the terms of the Agreement. After the Bank funded the Equity Take Out, defendant caused WTC to issue checks as follows: (1) a check to Zimmerman in the amount of $216,712.00; (2) a check to BBC in the amount of $673,288.00; and (3) a check to Member A in the amount of $110,000.00.

## The Ten Percent Rule

22.     The "Ten Percent Rule" was a WTC Lending Policy that permitted an RM to extend credit up to ten percent (10%) of the total commitment of a customer relationship without approval of the WTC Loan Committee. Under the Lending Policy, the Ten Percent Rule applied to the extension of new credit, up to the total amount of $1,000,000.00. The Ten Percent Rule

6

could be utilized only if the customer relationship had $5,000,000.00 or more in total credit, and the relationship had been approved by the Bank's Loan Committee for new or renewed credit within the past twelve months. Effective May 6, 2009, RMs were also permitted to apply the Ten Percent Rule to renew existing term loans up to $1,000,000.00, if the loans were part of a relationship totaling in excess of $5,000,000.00.

23.     Prior to December 2008, extensions of credit under the Ten Percent Rule required only the approval of an RM and his/her Division Manager. Following that date, the Ten Percent Rule was amended to require that all extensions of credit under the Ten Percent Rule also be approved by a Credit Officer, a Senior Credit Officer, or the Bank's Chief Credit Officer.

24.     A "working capital line of credit" is a revolving credit facility typically extended to an established business to fund operating expenses and is granted on the strength of the borrower's cash flow and accounts receivable.

25.     An "interest reserve" loan is a lending facility that permits loan funds to be advanced to a borrower to pay interest charges on the outstanding balance of the loan. The interest is capitalized and added to the loan balance.

26.     On multiple occasions, defendant and Bank Employee A extended credit under the Ten Percent Rule prior to Loan Committee approval, the same date as Loan Committee approval, or shortly following Loan Committee approval. These Ten Percent Rule approvals, which were often granted in the nature of a working capital line of credit or an interest reserve loan, had the effect of supplying borrowers' equity in a project and/or increasing the Bank's Loan to Value ("LTV") exposure beyond that approved by the Loan Committee or permitted by Bank policy. Examples of such uses of the Ten Percent Rule include the following:

7

A. On September 14, 2005, the Bank's Loan Committee approved a commercial mortgage loan for Borrower A for a particular project in the amount of $3,960,000.00. The approved amount was $140,000.00 less than the amount originally requested by defendant. On September 21, 2005, the loan closed and the funds were remitted to Borrower A. That same day, Borrower A received a $140,000.00 working capital line of credit that had been requested by defendant and approved by Bank Employee A on August 25, 2005 – nearly one month earlier – under the Ten Percent Rule. Defendant did not reference the $140,000.00 working capital line of credit in either the LADS or the memorandum submitted to the Bank's Loan Committee in connection with the commercial mortgage.

B. On November 23, 2005, the Bank's Loan Committee approved a loan for Borrower B in the amount of $1,600,000.00, which represented a maximum LTV of 80% and required $450,000.00 in borrower's equity ($400,000.00 for acquisition of the property and $50,000.00 applied to loan fees). Seven days after the Loan Committee approval, on November 30, 2005, defendant requested, and Bank Employee A approved, a $650,000.00 increase in the loan to $2,250,000.00 under the Ten Percent Rule. On that same day, the $2,250,000.00 loan closed and Borrower B received $335,049.00 in cash from the transaction.

C. On December 13, 2006, defendant and Borrower C executed a loan agreement for a line of credit in the amount of $500,000.00. Defendant did not request approval from the Bank's Loan Committee for the transaction. On December 20, 2006, the Loan Committee approved an increase in an existing commercial mortgage loan to Borrower C in the amount of $820,000.00, for a total loan value of $1,260,000.00.

8

Defendant represented in documents provided to the Loan Committee that $94,500.00 in cash equity would remain in the deal against the purchase price and closing costs of $1,354,500.00. Defendant did not inform the Loan Committee of the $500,000.00 line of credit that had been executed on Borrower C's behalf under the Ten Percent Rule. On December 21, 2006 – one day after the Loan Committee had approved the commercial mortgage – Bank Employee A approved the $500,000.00 line of credit retroactively under the Ten Percent Rule. That same day, the Bank advanced $93,933.00 under the line of credit to Borrower C, roughly the same amount that defendant had represented to Loan Committee would remain in the project as equity.

D.      On July 25, 2007, the Loan Committee approved two loans for Borrower D in the amounts of $255,000.00 and $240,000.00, respectively. The memorandum submitted in connection with the LADS indicated that the LTV was 75% for the first loan and 80% for the second loan, and further stated "in no event will LTV exceed those levels." The same day that the loans were approved by the Loan Committee, defendant requested, and Bank Employee A approved, a $70,000.00 increase in the first loan (to a total of $325,000.00) and a $20,000.00 increase in the second loan (to a total of $260,000.00). Both of the loans were approved under the Ten Percent Rule.

27.      Defendant, Bank Employee A, and other individuals known to the United States Attorney also used the Ten Percent Rule to extend additional credit to borrowers for the purpose of establishing supplemental interest reserves and working capital lines of credit. The supplemental interest reserves and working capital lines of credit were utilized to keep original loans on non-performing projects current, and to keep the loans from being classified as past due

9

and/or non-accrual loans. Examples of such uses of the Ten Percent Rule include, but are not limited to, the following:

  A. In calendar year 2007, defendant and Bank Employee A utilized the Ten Percent Rule on at least ten (10) occasions with respect to projects in which Zimmerman was a partner, in the total amount of at least $1,790,000.00. In calendar year 2008, defendant used the Ten Percent Rule on at least seven (7) occasions to extend credit to Zimmerman-related projects in the total amount of at least $2,338,787.95.

  B. On January 16, 2008, defendant utilized the Ten Percent Rule to approve a supplemental interest reserve for Borrower A for the project described in paragraph 26.A in the amount of $39,690.00 – which represented 10% of the original loan approved by the Bank's Loan Committee in September 2005.

  C. In calendar year 2007, defendant and Bank Employee A utilized the Ten Percent Rule on at least four (4) occasions to extend credit to various projects developed by Borrower D in the total amount of at least $216,962.50. In calendar year 2008, defendant and Bank Employee A utilized the Ten Percent Rule on at least twelve (12) occasions to extend credit to Borrower D, in the total amount of at least $2,096,962.50.

  D. In calendar year 2007, defendant and Bank Employee A utilized the Ten Percent Rule on at least nine (9) occasions to extend credit to various projects developed by Borrower E in the total amount of at least $1,830,000.00. In calendar year 2008, defendant extended $340,000.00 in additional credit to Borrower E under the Ten Percent Rule.

  E. Between February 6, 2006, and August 5, 2008, defendant and Bank Employee A utilized the Ten Percent Rule to approve at least eight (8) working capital

lines of credit for Borrower F in the total amount of $2,650,000.00. Four of these lines of credit, totaling $750,000.00 were unsecured; three of these lines of credit, totaling $850,000.00, were used to fund existing lines of credit that were never repaid; and the eighth line of credit was secured by second and third mortgages on real estate already financed by WTC.

### Matured Loans Waived From Past Due and Non-Accrual Reporting

28.     On a quarterly and annual basis, banks are required to report the total amount of past due and nonperforming loans. On a quarterly basis, banks report such loans on a Schedule RC-N – known informally as a "Call Report" – filed with the Federal Financial Institutions Examination Council ("FFIEC"). On a quarterly and annual basis, publicly-traded banks, like WTC, also report their past due and nonperforming loans to the Securities and Exchange Commission ("SEC") on Forms 10-Q and 10-K, respectively. The Bank relied upon data compiled in a monthly Past Due and Nonperforming Loan List (the "Past Due List") to satisfy these reporting obligations.

29.     A "matured loan" is a term loan in which the principal payment is past due and must be repaid to the lender in full. The definition of a "past due" loan with respect to loans that have matured is set forth in the instructions to prepare Schedule RC-N. Under the Call Report instructions, a loan "providing for the payment of interest at maturity [is] to be reported as past due after maturity if interest or principal remains unpaid for 30 days or more."

30.     During the time period set forth in the Information, the Bank did not follow the definition of a "past due loan" with respect to its reporting obligations. Rather, the Bank "waived" (i.e., failed to report) matured loans from being reported on the Past Due List if the Bank considered such loans to be "in the process of extension."

31.     The Bank's Commercial Loan Non-Accrual Policy (the "Non-Accrual Policy")
stated that the Bank's Loan Recovery Section was to review on a monthly basis "all loans
reported past due 90 days or more with respect to principal and/or interest to determine the need
to suspend interest accrual." The Non-Accrual Policy stated further, "Loans that have matured
but remain current for interest and are in the process of extension and/or modification generally
will not be placed on non-accrual unless future repayment ability is in jeopardy."

32.     Effective November 2008, the Bank adopted a new Appraisal Policy that required
a valuation to be performed on all real estate securing loans in an amount of $250,000.00 or
more. The Appraisal Policy stated that appraisals for real estate transactions were not required
if:

> There is a subsequent transaction resulting from a maturing extension of credit,
> provided that the borrower has performed satisfactorily according to the original
> terms, no new monies have been advanced other than previously agreed, the credit
> standing of the borrower has not deteriorated, and *there has been no obvious and*
> *material deterioration in market conditions (in the opinion of the appraisal*
> *section)* or physical aspects of the property that would threaten the Bank's
> collateral position.

(Emphasis added). The language in the Appraisal Policy tracked federal regulations, which
indicated that appraisals were required for extending credit for transactions greater than
$250,000 unless "[t]here has been *no obvious and material change in market conditions or*
*physical aspects of the property that threatens the adequacy of the institution's real estate*
*collateral protection after the transaction*, even with the advancement of new moneys." 12
C.F.R. § 34.43(a)(7)(i) (emphasis added).

33.     As early as January 2009, defendant was aware that the Bank was not reporting its
matured loans as past due. On January 16, 2009, Bank Employee B sent an email to defendant,

12

Bank Employee A, Bank Employee C, and Bank Employee D, among others, stating the

following:

> We would like to hold a brief meeting on Wednesday 1/21 immediately following Loan
> Committee to discuss addressing the practice of waiving loans that are matured but
> current for interest from our past due reporting. I had thought that for the last few
> quarters that we were trying to only waive bank errors or loans that had made it through
> the approval process but were not booked in time to come off delinquency. Apparently
> that has not exactly been reality. At 12/31/08 the total of matured/waived stood at over
> $105 million and nearly 80 loans.

> With your input, we would like to set a reasonable goal/game plan for getting these loans
> renewed/extended and allowing the system to report a true past due number without a lot
> of adjustments that could raise issues for us at some point in the future.

34.     The new appraisal policy, implemented shortly before the above email was sent –

particularly its requirement to obtain appraisals in situations where there were "obvious and

material" changes in market conditions – caused significant issues at WTC. By no later than

early-2009, defendant and Bank Employee A realized that the appraised values for residential

real estate projects that had matured were dropping substantially. On April 8, 2009, defendant

sent Bank Employee A an email entitled "Residential Maturities," in which he wrote, "Let's

discuss this list before you do anything with it. I had a long conversation with [Bank Employee

C] and [Bank Employee E] after loan committee regarding the Appraisal problem." Defendant

attached to the email a spreadsheet of the Delaware Commercial Real Estate Division's

Residential Construction projects that had received or were due to receive an updated appraisal

in the Second Quarter of 2009. Bank Employee A responded, "Thanks for getting me this info

so quickly. We need to address asap. As I suspected this list is not comprehensive of the bank

just your portfolio and has the near term potential for catastrophic consequences. . . We need to

not paint ourselves in a corner to make the regulators or examiners feel good about our process."

35.     Approximately one week later, defendant was involved in an email exchange with a number of WTC employees, including Bank Employee A and Bank Employee F. The initial portion of the email chain discussed whether federal LTV standards applied in situations where loans were renewed, refinanced or restructured without the advancement of new funds. Defendant responded to the email, asking Bank Employee F whether "we would not need to apply LTV limits for a renewal of a pass-rated credit and could therefore keep it out of the [real estate] exception pool." Bank Employee F responded, "That is how I read it." Bank Employee F, however, added the following: "It does not mean that we don't have to re-appraise them, though, the regs are pretty clear on the need for reappraisals." Defendant replied, "The days they are a changin' but I believe this is good news.  [Bank Employee E] - can we reconvene the appraisal summit asap so we can all get on the same page and get some matured loans extended!"

36.     Defendant understood that updated appraisals would have required WTC to recognize losses on the credits and would have had a negative impact on WTC's Allowance for Loan and Lease Losses ("ALLL"). Defendant, however, did not obtain updated appraisals for many of the matured and maturing loans in his portfolio. Bank Employee A instructed defendant not to order appraisals for credits due to be renewed.  As a result of this and other communications, defendant did not order new appraisals for matured loans in his portfolio due to be renewed.

37.     As a result, matured loans remained on the Bank's Past Due List indefinitely. At times relevant to this Information, Bank Employee B completed a monthly report of past due loans (the "Delinquency Report"). To complete the report, Bank Employee B contacted RMs regarding whether matured loans under their control, which were current for interest, could be

14

waived from the Delinquency Report as "in the process of extension." If an RM responded that he or she was "working on" an extension, that would be sufficient, without further analysis, to waive the loan from past due reporting.

38.     After Bank Employee B finalized the Delinquency Report, he forwarded it to employees in the Bank's Finance Department to prepare the Past Due Report. To complete the Past Due Report, those employees removed all loans that had been listed as "waived" on the Delinquency Report.

39.     From in or around March 31, 2009, through on or about November 30, 2009, defendant represented to the Credit Department that the matured loans under his supervision were in the "process of extension." As a result, these relationships were then listed on the monthly Delinquency Reports as waived loans "in the process of renewal." In actuality, defendant had taken no action to extend the loans, and a number of the matured loans appeared for multiple consecutive months on the Delinquency Reports as "in the process of renewal." Examples of such relationships included numerous loans made to Borrowers A and D that had matured, but which defendant took no efforts to extend. Based upon defendant's representations, and the representations, actions, and knowledge of other co-conspirators, the matured loans were waived from the Bank's Past Due Report and not reported as being either 30-89 days past due, 90 days past due, or placed on non-accrual status.

40.     The actions of defendant and his co-conspirators had the following impact with respect to the Bank's public financial reporting in 2009:

        A.      First Quarter 2009

        1.      As a result of the actions of defendant and his co-conspirators, on March 31, 2009, the matured loans that were not reported as past due or on non-accrual status

because they were listed on internal Bank documents as having been "waived," were in excess of $186,000,000. This total included loan values in excess of $140,000,000 that were 30-89 days past due, and approximately $46,000,000 in loans that were at least 90 days – and up to 1126 days – past due.

2.      At least $68,000,000 of the total amount of loans waived from the Past Due List as of March 31, 2009, were loans for client relationships in which defendant was, or had been, the RM. This figure included approximately $46,000,000 in loans that were 30-89 days past due, and approximately $22,000,000 in loans that were at least 90 days past due.

        B.      Second Quarter 2009

1.      As a result of the actions of defendant and his co-conspirators, on June 30, 2009, the matured loans that were not reported as past due or on non-accrual status because they were listed on internal Bank documents as having been "waived," were in excess of $234,000,000. This total included loan values in excess of $46,000,000 that were 30-89 days past due, and approximately $188,000,000 in loans that were at least 90 days – and up to 699 days – past due.

2.      Approximately $78,000,000 of the total amount of loans waived from the Past Due List as of June 30, 2009, were loans for client relationships in which defendant was, or had been, the RM. This figure included at least $8,000,000 in loans that were at least 30-89 days past due, and approximately $70,000,000 in loans that were at least 90 days past due. Approximately $54,000,000 of the loans at least 90 days past due were between 180-272 days past due.

C.    Third Quarter 2009

1.    As a result of the actions of defendant and his co-conspirators, on September 30, 2009, the matured loans that were not reported as past due or on non-accrual status because they were listed on internal Bank documents as having been "waived," were in excess of $463,000,000. This total included loan values in excess of $112,000,000 that were 30-89 days past due, and approximately $351,000,000 in loans that were at least 90 days – and up to 791 days – past due.

2.    Approximately $110,000,000 of the total amount of loans waived from the Past Due List as of September 30, 2009, were loans for client relationships in which defendant was, or had been, the RM. This figure included approximately $9,000,000 in loans that were 30-89 days past due, and approximately $101,000,000 in loans that were at least 90 days past due. Approximately $66,000,000 of the loans at least 90 days past due were between 182-364 days past due.

**Mass Extensions of Expired and Matured Commitments**

41.    On September 16, 2009, Bank Employee F sent an email to defendant and several other employees, including Bank Employees A-E, which highlighted problems with the Bank's treatment of matured loans:

> The level of loans which have been matured 90+ days needs to be better managed. The list below reflects the accounts which had to be researched this month for potential movement to nonaccrual, based upon the delinquency associated with the account. (A maturity billing is a principal billing, and to the extent the maturity is not addressed, principal is delinquent. That delinquency grows until the loan is repaid or otherwise extended). Several of these accounts have been the subject of conversations for multiple consecutive months. For now, I am explaining that an "extension is in process" [i]s a means to avoid unnecessary transfers to nonaccrual. In this era of SOX and second-guessing, I do not think that this can continue for much longer.

17

42.     At or around that same time, in fall 2009, the Bank decided to undertake a mass extension process of over 1,250 loans totaling at least $1.744 Billion.  The Bank committed to extending: (a) 803 matured or maturing loans by December 31, 2009, totaling approximately $1,312,000,000; and (b) an additional 450 loans maturing between January 1, 2010 and April 20, 2010, totaling approximately $432,000,000.     The Bank's Lending Policy permitted the temporary extension of expired commitments or matured loans under certain circumstances up to a total of 90 days with supervisory approval.  The Bank's Lending Policy, however, required that "[a]ny extension of a matured loan must be documented with a Change in Terms Agreement, signed by the borrower."

43.     On October 29, 2009, Bank Employee D sent an email to defendant and Bank Employees A-C and E requesting a meeting to "Discuss process and strategy to eliminate matured loans by 12/31."  In the email, Bank Employee D stated that "it is extremely important that we talk about matured loans and how we can make them go away by 12/31.  This cannot be a quick fix for 90 or 120 days as the problem will just return."  Bank Employee D further stated, "This has the attention of all the wrong people: [the Chief Executive Officer], [the Bank President], [the Chief Financial Officer], Examiners, Auditors."

44.     On November 20, 2009, Bank Employee D forwarded an email from Bank Employee E to defendant, Bank Employee A, and others.  In the original email, Bank Employee E wrote to Bank Employee D, "On expired real estate deals that *we are awaiting appraisals to complete our credit underwriting for a renewal* we will extend those loans until March 1, 2010, provided: 1. We have a LADS coversheet and 2. Some basic analysis and write-up that is attached to that LADS that gives us enough information to make a short-term credit decision." (Emphasis added).  In forwarding the email, Bank Employee E added:

Hope this further clarifies where we are *with matured loans that need appraisals that could cause renewal not to occur by the 12/31 deadline.* As [Bank Employee G] says, they can be renewed until 3/1/10 with the info listed subject to receiving the appraisal.

(Emphasis added). Thus, Bank officials recognized that the loans being extended – which were part of the mass-waiver program described in paragraphs 28-40 above – required appraisals.

45.     As part of the mass-extension process, defendant submitted memoranda requesting the Bank's Loan Committee to extend his matured and maturing loans. These requests included the following:

A.      Borrower A

1.      On December 30, 2009, defendant submitted a memorandum to the Bank's Loan Committee requesting the temporary extension of multiple loan facilities in the Borrower A relationship until April 2010. Included in the list of loans to be extended were multiple loans which had been waived from the Bank's Past Due List because they were listed on the Delinquency Reports as having been "in the process of extension" for multiple months in 2009. The Loan Committee approved the request that same day, and further required Borrower A to pay an interest rate of 4% on all matured loans to begin as of December 1, 2009.

2.      On March 31, 2010, defendant submitted an additional memorandum to Loan Committee requesting that the short-term extension be reaffirmed and extended through December 31, 2010. Defendant noted in the memorandum that "[d]ue to timing issues, the extension documents were never executed by the principal of the [Borrower A] entities." Defendant further requested that the interest rate discussed above begin as of June 1, 2010, as it had not been implemented to date. The memorandum stated that the outstanding balance for Borrower A as of December 26, 2009 was $94,048,889.

19

3.     On or about March 31, 2010, the Loan Committee approved defendant's supplemental extension request.

B.     Borrower D

1.     On December 22, 2009, defendant submitted a memorandum requesting the Bank's Loan Committee to temporarily extend approximately $8,909,499 in matured loans relating to the Borrower D. The Loan Committee approved the extension request on or about December 30, 2009.

2.     On April 7, 2010, another bank employee submitted a supplemental memorandum seeking to "reaffirm and extend matured and maturing loans associated with the [Borrower D] group of companies." The memorandum stated that an extension until August 1, 2010, would permit the Bank to "have an opportunity to gather updated financial information and develop a long term plan for the various [Borrower D] entities." Included in the list of loans to be extended were multiple loans which had been waived from the Bank's Past Due List because they had been listed on the Delinquency Reports as having been "in the process of extension" for multiple months in 2009. The memorandum stated that the outstanding balance for Borrower D as of December 26, 2009 was $11,697,190.00.

3.     On or about April 23, 2010, the Loan Committee approved the supplemental extension request.

46.     As a result of the actions of defendant and his co-conspirators, the matured loans that were extended under the mass-extension process were not reported as past due or on non-accrual status. The total amount of past due loans not reported as of December 31, 2009, because they were listed on internal Bank documents as having been "waived," were in excess of $373,000,000. This total included loan values in excess of $43,000,000 that were 30-89 days

past due, and approximately $330,000,000 in loans that were at least 90 days – and up to 1,280 days – past due.

47.     Approximately $148,000,000 of the total amount of loans waived from the Past Due List as of December 31, 2009, were loans for client relationships in which defendant was, or had been, the RM.  This figure included approximately $6,000,000 in loans that were 30-89 days past due and approximately $142,000,000 in loans that were at least 90 days past due. Approximately $95,000,000 of the loans that were at least 90 days past due were between 180-456 days past due.

48.     The Bank utilized the December 31, 2009 past due loan figures in its 2009 Form 10-K, filed with the SEC in February 2010.  That Form 10-K was the basis for the Bank's proxy statement submitted in connection with a capital raise that resulted in the sale of approximately $274,000,000 in WTC stock.

All in violation of Title 18, United States Code, Section 371.

CHARLES M. OBERLY, III
United States Attorney

By:     _Robert F. Kravetz_

Robert F. Kravetz
Assistant U.S. Attorney

By:     _Lesley F. Wolf_

Lesley F. Wolf
Assistant U.S. Attorney

Dated:  April 10, 2013.

21